# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### LAFAYETTE DIVISION

| | | |
|---|---|---|
| TIPPECANOE COUNTY RIGHT TO LIFE, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CASE NO. _____ |
| GREATER LAFAYETTE PUBLIC TRANSPORTATION CORPORATION, doing business as CITYBUS, | ) ) ) ) | |
| Defendant. | ) | |

## <u>VERIFIED COMPLAINT</u>

Plaintiff Tippecanoe County Right to Life, Inc., by and through undersigned counsel, brings this Verified Complaint for declaratory and injunctive relief, as well as damages, against Defendant Greater Lafayette Public Transportation Corporation (d/b/a CityBus) and in support of its Verified Complaint alleges as follows.

## <u>INTRODUCTION</u>

1.      This case involves government discrimination against protected speech due to the viewpoint expressed.

2.      CityBus, a government-owned bus company that services Lafayette and West Lafayette, Indiana, encourages organizations to pay a fee to place ads on the inside and outside of its buses and touts the benefits of conveying messages to the public in this unique way.

3.      Many organizations have responded to CityBus's encouragement and utilized the buses operated by CityBus as mobile billboards to communicate messages to the public on a vast array of topics.

4.      Like those other organizations, Tippecanoe County Right to Life (TCRTL), a non-profit organization dedicated to protecting the right to life, determined that CityBus offered a unique, cost-effective way to educate some of its target audience.

5.      So TCRTL submitted an ad (pictured below) to CityBus to educate people regarding the fact that a child after birth is, biologically, the same human that he or she was before birth.



6.      TCRTL intended for this ad to be displayed as a "curb appeal" ad, meaning that it would appear on the sides of buses as a sign measuring approximately two feet tall and eight feet wide.

7.      To TCRTL's surprise, CityBus rejected the ad because it determined that it expressed a "political viewpoint" in violation of CityBus's Advertising Policy.

8.      This restriction is both facially and as-applied unconstitutional viewpoint discrimination.

9.      Also, CityBus has permitted multiple educational ads that could prompt political action or were even patently political on their face.

10.      CityBus has permitted ads encouraging people to "pump some democracy," "to file your free complaint of housing discrimination," to "help your neighbors in need," to "make the most of your future in the National Guard," to "promise to #ShopSmall in Greater Lafayette," and to quit smoking.

11.     CityBus has also permitted ads indicating that "1 in 5 Indiana teenagers are abusing prescription drugs," that peoples' "diabetes [go] unchecked" without the "Healthy Indiana Plan," and that "prenatal care" helps reduce infant deaths.

12.     By rejecting TCRTL's educational ad while accepting other educational ads and ads that are explicitly political, CityBus violated TCRTL's constitutional rights and discriminated against TCRTL by denying it equal access to CityBus's advertising forum.

13.     If not for CityBus's unconstitutional policies and practices, TCRTL would have run its ad, and TCRTL still wishes to run its ad with CityBus.

14.     TCRTL now challenges CityBus's unconstitutional policies and practices that prohibit protected speech, use vague terms, and grant unbridled discretion to CityBus's officials to ban protected speech based on the viewpoint expressed.

15.     TCRTL asks this Court to require CityBus to allow TCRTL's educational ad on its buses and to declare that certain provisions of CityBus's Advertising Policy violate the First and Fourteenth Amendments.

## JURISDICTION AND VENUE

16.     This action arises under the United States Constitution—particularly the First and Fourteenth Amendments—and under federal statutory law, particularly 42 U.S.C. § 1983.

17.     This Court has original jurisdiction under 28 U.S.C. §§ 1331 and 1343.

18.     This Court has authority to award the requested declaratory relief under 28 U.S.C. §§ 2201-02 and Federal Rule of Civil Procedure 57; the requested injunctive relief under 28 U.S.C. § 1343 and Federal Rule of Civil Procedure 65; the requested damages under 28 U.S.C. § 1343; and the requested costs and attorneys' fees under 42 U.S.C. § 1988 and Federal Rule of Civil Procedure 54.

19.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because all events giving rise to the claims herein occurred within the Northern District of Indiana and the Defendant is located in the Northern District of Indiana.

## PARTIES

20.     Plaintiff Tippecanoe County Right to Life, Inc. (TCRTL) is a non-profit corporation based in Lafayette, Indiana.

21.     Defendant Greater Lafayette Public Transportation Corporation is a municipal corporation organized under the laws of Indiana that may sue and be sued.

22.     Defendant Greater Lafayette Public Transportation Corporation operates under the name "CityBus."

23.     CityBus's headquarters are located in Lafayette, Indiana.

24.     CityBus adopted and is responsible for the Advertising Policy and the application of that policy challenged in this lawsuit.

25.     CityBus is charged, *inter alia*, with the administration, operation, and supervision of all of CityBus's advertising forums.

26.     CityBus is also charged with the formulation, adoption, implementation, and enforcement of certain municipal policies and practices, including CityBus's policies and practices governing ads that can appear on or in CityBus's buses.

27.     CityBus is responsible for its employees,' officers,' and officials' implementation, application, and enforcement of CityBus's policies and practices governing advertising on or in CityBus's buses.

28.     Pursuant to its policies and practices governing ads on or in CityBus's buses, CityBus rejected an ad submitted by TCRTL for placement on CityBus's buses.

## FACTUAL ALLEGATIONS

**Tippecanoe County Right to Life**

29.     Tippecanoe County Right to Life, Inc. (TCRTL) is a non-profit corporation based in Lafayette, Indiana and is exempt from federal income tax requirements under Internal Revenue Code § 501(c)(3).

30.     Since 1974, TCRTL has existed to protect the right to life, with a special focus on guaranteeing the right to life for unborn children.

31.     To further this mission, TCRTL employs various strategies, such as educating the public about abortion and the attributes of unborn children, promoting collaboration between organizations that share a pro-life mission, supporting pro-life initiatives, activating and coordinating grassroots efforts, and working with pregnancy resource centers to ensure that women facing crisis pregnancies are informed of the options available to them if they choose to carry their children to term.

32.     Education is one of the primary strategies that TCRTL employs to advance its cause of defending human life.

33.     TCRTL believes that it is critical to educate the public about the humanity of unborn children and the harms of abortion.

34.     Basic biology confirms that a baby that has been birthed is the same human person that he or she was when developing in the womb, just as a teenager is the same human person—although at a different stage of development—that he or she was when a toddler.

35.     TCRTL believes that one reason abortion is permitted in America is that many people do not understand the scientific truth about the humanity of unborn children.

36.     Therefore, TCRTL educates the public about the humanity of unborn children and the reality of abortion through multiple mediums, including television ads, ads in the *Journal & Courier*, billboards, its own website, its annual "Celebration of Life" gala, and a booth it operates at the annual Tippecanoe County 4-H Fair that features materials such as posters, pamphlets, stickers, and models of unborn children at various stages of development.

**TCRTL's Attempt to Educate the Public by Advertising with CityBus**

37.     To further its mission of educating the public about the humanity of unborn children, TCRTL's Board of Directors discussed the possibility of running an ad on buses operated by CityBus.

38.     CityBus's policy and practice is to permit certain forms of ads on the sides of its buses, on the back of its buses, inside of its buses, and wrapped almost entirely around its buses.

39.     CityBus encourages ads on its buses, and its website states: "Keep your message moving! Include CityBus in your advertising plan! CityBus provides over 5 million rides each year, making it the 2nd largest public transit system in the state.  That's a lot of miles and a LOT of eyes seeing your message." *Available at* https://www.gocitybus.com/advertise.

40.     CityBus even uses its own buses to promote advertising with CityBus.

41.     One CityBus ad displayed on the side of a bus proclaims: "Wishing for more from your advertising? Advertise with CityBus!"

42.     CityBus also boasts that advertising with CityBus is "a perfect way to reach Purdue Students, who make up about 70% of CityBus riders," and is also a great way to reach youth and individuals who cannot afford vehicles.  *Available at* https://www.gocitybus.com/advertise/interior-cards.

43.     TCRTL considers it particularly important to reach young people, college students, and low-income individuals—the very demographics that CityBus claims its bus ads regularly reach—with its message about the humanity of unborn children because TCRTL believes that those individuals are more likely than many other segments of society to face crisis pregnancies and consider abortion as an option.

44.     Moreover, TCRTL desires to educate Purdue students about the humanity of unborn children because TCRTL believes that people often form their worldviews in college and that the worldviews they adopt in college will often influence their actions and decisions as they leave college and become the leaders of tomorrow.

45.     Thus, advertising with CityBus presents a unique opportunity for TCRTL to reach some of its desired audience in a way that is incomparable to other mediums.

46.     TCRTL's Board determined that advertising with CityBus was a promising, cost-effective way to educate the public.

47.     Acting on TCRTL's behalf, then-TCRTL Board Member Staci Lee Rice contacted CityBus to begin a conversation about TCRTL advertising on CityBus's buses.

48.     On September 26, 2017, Bryce Gibson, CityBus's Manager of Development, e-mailed Rice and indicated that CityBus "would be happy to put together a proposal for you if you can provide a budget."

49.     On October 1, 2017, Rice responded to Gibson and indicated that she believed the budget "would be around $1,000-$1,200 for now."

50.     In that e-mail, Rice also asked if Gibson could indicate which bus routes are "more frequented on [the Purdue] campus and in Lafayette around Greenbush."

51.    One reason TCRTL was interested in pursuing its educational campaign on a bus that frequents the Greenbush area is because that area includes significant numbers of low-income households, which TCRTL believes are at a heightened risk of facing crisis pregnancies and considering abortion as an alternative.

52.    Gibson responded to Rice on October 2, 2017, and indicated that routes frequenting the Greenbush area and Purdue University were available for advertising, that CityBus would provide Rice with the technical specifications for the ad (so it could be designed accordingly), and that November 1 was the earliest that CityBus could begin displaying the ad.

53.    Gibson also explained that, after receiving the design, CityBus would produce the ad.

54.    Gibson further explained in his October 2, 2017, e-mail that advertising on two buses for two months with a curb-appeal ad would result in a cost of around $1,434.

55.    The TCRTL Board considered what ad to run with CityBus, and settled on running an ad with three pictures positioned side-by-side.

56.    Two of the pictures depict ultrasound images of an unborn child, and the third picture depicts an infant wrapped in a blanket.

57.    The word "ME" is superimposed over the first picture, the words "ME, AGAIN" are superimposed over the second picture, and the words "STILL ME" are superimposed over the third picture.

58.    The ad also includes the words "Tippecanoe County Right to Life" and TCRTL's website address, "tcrtl.com."

59.    A true and correct depiction of the ad that the TCRTL Board desired to run on CityBus ("TCRTL's ad") and that Rice submitted to CityBus is pictured above at paragraph 5.

60.    Because many students at Purdue University would be away from campus during the holidays in November and December, the TCRTL Board decided to place TCRTL's ad on the bus route that includes the Greenbush area during November and December 2017, and on a bus that frequents Purdue University during the months of January and February 2018.

61.    If TCRTL's ad was successful in its first four months on CityBus's buses, TCRTL planned to continue running ads on CityBus's buses to educate the public regarding the humanity of unborn children.

62.    TCRTL expected its ad to be successful because advertising on CityBus reaches a broad audience of drivers, pedestrians, and bus riders over broad geographic areas on a recurring basis, in a way that no other media platform does.

63.    On October 16, 2017, Erica Metzinger, a CityBus employee, sent Rice a contract to sign that was already electronically signed by Gibson on October 16, 2017.

64.    The contract specified that the "City Bus Advertised Product(s)/Company" was "Tippecanoe County Right to Life."

65.    The contract indicated a total cost of $1,434.00 for CityBus to print and run a curb-appeal ad (24.5 inches by 99.75 inches) during November and December 2017 on one bus and during January and February 2018 on another bus.

66.    On October 23, 2017, Rice provided an electronic file to CityBus with the design of TCRTL's ad.

67.    Rice also went to a CityBus facility and signed the contract, which Gibson signed again (on the same paper Rice signed, which contained exactly the same terms as the contract Gibson electronically signed on October 16, 2017).

**CityBus's Denial of TCRTL's Educational Ad**

68.     On October 25, 2017, Gibson e-mailed Rice to inform her that TCRTL's ad, "[p]ursuant to CityBus's policies and procedures," was "reviewed by the Development Manager and General Manager" of CityBus and "is rejected as submitted" because "the proposed advertisement does not comply with CityBus's guidelines."

69.     Specifically, the e-mail from Gibson included a block quote from CityBus's Advertising Policy, which prohibits, among other things, "political campaign speech referring to a specific ballot question (other than candidates for office, see below), initiative petition, referendum, or **political viewpoint**" (emphasis in e-mail).

70.     The e-mail from Gibson also quoted the portion of CityBus's Advertising Policy stating that "**CityBus accepts advertising that meets all of the following criteria for political advertising for candidates for office: (1) No statement of political viewpoint**, initiative petition, or referendum is made in the advertisement. . . . (4) Graphics contained in the advertisement do not imply a political viewpoint" (emphasis in e-mail).

71.     Ironically, Gibson's October 25, 2017 e-mail claimed that CityBus's Advertising Policy is "enforced without regard to the identity of the advertiser or the viewpoint of the advertisement."

72.     Gibson's e-mail also stated that CityBus "has allowed advertisement by organizations which **evoke political sentiments** when the advertisement does not exhibit a political viewpoint" (emphasis added).

73.     CityBus has indeed accepted ads by multiple organizations that evoke political sentiments.

74.    Gibson's e-mail further explained that "CityBus has allowed political campaign speech" so long as it complies with the policies Gibson quoted.

75.    TCRTL's ad seemingly complies with those policies because it is not "political campaign speech" or "political advertising for candidates for office."

76.    Despite Rice's multiple prior communications with CityBus and her execution of a contract with CityBus, Rice had not been informed of or made aware of CityBus's Advertising Policy until CityBus's denial of TCRTL's ad.

77.    Upon information and belief, when Rice submitted TCRTL's ad to CityBus, CityBus's Advertising Policy was unavailable (and remains unavailable) on CityBus's website even though the website includes other details about advertising with CityBus.

78.    On October 26, 2017, the day after CityBus rejected TCRTL's ad, Kevin Niebrugge, who was and remains the President of TCRTL, e-mailed Gibson and explained that TCRTL's "mission is to educate so as to save lives," that TCRTL's ad simply informs people about "natural human development," and that simply stating "the fact that an embryo in the womb can develop into a baby . . . does not seem political."

79.    Noting his concern that if TCRTL's ad does not comply with CityBus's Advertising Policy, "we're not sure what type of ad we would run" that would comply, Niebrugge asked in his October 26 e-mail for "a better explanation" of why CityBus concluded that TCRTL's ad did not comply with its Advertising Policy.

80.    At their invitation, Niebrugge met with Gibson and Martin Sennett, the General Manager for CityBus, on October 27, 2017.

81.    At the meeting, Sennett explained that CityBus could not accept TCRTL's ad because it impermissibly stated a political viewpoint as a result of the combination of the ad's

three pictures (two depicting a child while in utero and one depicting a child at some point after birth), the words "Me," "Me, Again," and "Still Me" superimposed over the pictures, and the name "Tippecanoe County Right to Life" appearing on the ad.

82.    Sennett asserted that if CityBus accepted TCRTL's ad, it might have to accept ads from other organizations—like ones that wear hoods and burn crosses.

83.    Niebrugge understood Sennett's statement about an organization wearing hoods and burning crosses to refer to the Ku Klux Klan.

84.    In rejecting TCRTL's ad and explaining the rejection, CityBus never disputed or questioned the factual accuracy of TCRTL's ad.

85.    Niebrugge asked what TCRTL could change on TCRTL's ad to make it acceptable to CityBus.

86.    Sennett indicated that TCRTL could publish an informational notice, such as when TCRTL has public meetings.

87.    Niebrugge also asked whether TCRTL's ad would be acceptable to CityBus if references to TCRTL were removed from the ad, but Gibson responded that CityBus's Advertising Policy requires that the name of an ad's sponsor appear on the ad.

88.    Niebrugge then asked whether it would be acceptable to CityBus if another organization ran TCRTL's ad, but with references to that organization rather than TCRTL on the ad.

89.    In response, Gibson and Sennett indicated that they would need to consult with CityBus's attorneys regarding whether that would be acceptable.

90.    Gibson explained that he was sure that an ad just showing a baby and listing certain organizations other than TCRTL as the sponsor would be allowable.

91.     On October 31, 2017, Sennett called Niebrugge to inform him that he had consulted with CityBus's attorneys and that it would be acceptable for a certain organization other than TCRTL to run TCRTL's ad if (1) the words "Me," "Me, Again," and "Still Me" superimposed over the three pictures were removed and (2) the ad indicated that the other organization, rather than TCRTL, was the sponsor of the ad.

92.     Thus, CityBus viewed the words "Me," "Me, Again," and "Still Me" in the context of the ad to violate its Advertising Policy prohibiting certain political speech.

93.     CityBus also viewed the words "Tippecanoe County Right to Life" in the context of the ad to violate its Advertising Policy prohibiting certain political speech.

94.     CityBus also viewed "tcrtl.com" (TCRTL's website address) in the context of the ad to violate its Advertising Policy prohibiting certain political speech.

95.     CityBus's Advertising Policy does not call for consideration of the advertising organization's name or website when assessing whether the organization's ad complies with the terms of CityBus's Advertising Policy.

96.     TCRTL's Board decided against asking another organization to run the ad CityBus would allow—an ad without the words "Me," "Me, Again," and "Still Me"—because doing so would not accomplish its goal of educating the public about the humanity of unborn children, nor would it educate the public about TCRTL itself.

**CityBus's Advertising Policy**

97.     CityBus's Advertising Policy specifies that CityBus will "permit certain forms of public service, commercial, and other advertising in or upon CityBus vehicles and facilities."

98. CityBus's Advertising Policy states that CityBus "desires to avoid any endorsement, implied or otherwise, of advertisements or the viewpoints of advertisers," thereby indicating that third-party advertisers—not CityBus—speak through their ads.

99. As reflected in the e-mail that Gibson sent to Rice on October 25, 2017, CityBus's Advertising Policy prohibits certain political speech.

100. Specifically, CityBus's Advertising Policy provides as follows:

CityBus shall not display or maintain any advertisement that falls within one or more of the following categories:

. . .

Political campaign and viewpoint speech. The advertisement contains political campaign speech referring to a specific ballot question (other than candidates for office, see below), initiative petition, referendum, or political viewpoint.

CityBus accepts advertising that meets all of the following criteria for political advertising for candidates for office: (1) No statement of a political viewpoint, initiative petition, or referendum is made in the advertisement. (2) The advertisement contains only the candidate's name and political party affiliation, picture or graphic representation of the candidate, office the candidate is seeking, election date, and district the candidate is running in. (3) The advertisement includes a statement identifying the person or committee that is paying for the advertising. (4) Graphics contained in the advertisement do not imply a political viewpoint.

101. In addition to these prohibitions, CityBus's Advertising Policy also prohibits other types of ads, but CityBus did not claim that TCRTL's ad falls within any of those other prohibitions.

102. CityBus's Advertising Policy states that "CityBus reserves the right to suspend, modify, or revoke the application of any or all of these Standards as it deems necessary to comply with legal mandates, to accommodate its primary transportation function, and to fulfill the goals and objectives of CityBus."

103.    Thus, CityBus's policy and practice permits officials to reject an ad that satisfies the requirements of its Advertising Policy as written if the officials determine that rejecting the ad will "fulfill the goals and objectives of CityBus" or will "accommodate [CityBus's] primary transportation function."

104.    Similarly, CityBus's policy and practice permits officials to accept an ad that violates the requirements of its Advertising Policy as written if the officials determine that accepting the ad will "fulfill the goals and objectives of CityBus" or will "accommodate [CityBus's] primary transportation function."

105.    CityBus's Advertising Policy lacks any criteria to guide officials in determining when CityBus's Advertising Policy should be suspended, modified, or revoked in whole or in part "to fulfill the goals and objectives of CityBus" or to "accommodate [CityBus's] primary transportation function."

106.    Moreover, CityBus's Advertising Policy lacks any definitions or criteria to guide officials in determining what constitutes "political campaign speech referring to a . . . political viewpoint," a "statement of a political viewpoint," or "[g]raphics . . . [that] imply a political viewpoint."

107.    There are no regulations or guidelines regarding how CityBus officials are to interpret and implement the Advertising Policy, so officials have unbridled discretion to determine which ads to permit or reject based on their own subjective whims and preferred views.

108.    CityBus's Advertising Policy provides that CityBus's Development Manager (currently Gibson) and General Manager (currently Sennett) shall review each ad submitted for display on or in CityBus's buses to determine whether the ad "falls within, or may fall within,

one or more of the categories that violate the advertising Standards" set forth in CityBus's Advertising Policy, including the standards prohibiting certain political speech.

109.    CityBus's Advertising Policy provides that, after the General Manager's review, "[t]he Development Manager will send prompt, written, notification to the advertiser if the advertising has been rejected, and will include a copy of this policy and will specify which of the categories the advertisement falls within, or may fall within."

110.    Thus, CityBus's Advertising Policy not only provides for the rejection of ads that violate the Advertising Policy, but also ads that *may* violate the Advertising Policy, and CityBus provides no guidelines to its officials regarding how to determine when an ad should be rejected because it "may" violate CityBus's Advertising Policy.

111.    CityBus's Advertising Policy explains that, when rejecting an ad, "[t]he Development Manager, in his or her discretion, may include with the rejection suggestions to the advertiser of changes that could be made to the advertising to make it compliant with" the Advertising Policy.

112.    When Gibson e-mailed Rice on October 25, 2017 to inform her that CityBus rejected TCRTL's ad, he did not suggest changes to the ad.

113.    All of Gibson's and Sennett's decisions regarding TCRTL's ad and representations to TCRTL were made pursuant to CityBus's policies and practices and Gibson's and Sennett's authority to implement, apply, and enforce CityBus's policies and practices regarding advertising on or in CityBus's buses.

114.    Although CityBus's Advertising Policy allows advertisers to appeal rejections of their ads "to the advertising committee of the CityBus board of directors," TCRTL did not appeal the rejection because it believed the appeal would be futile.

16

**CityBus's Past Decisions Regarding Which Ads to Permit on its Buses**

115.    CityBus has accepted a variety of ads, including ads for banks, companies seeking to recruit new employees, lawyers seeking clients arrested for driving under the influence, a long-term care facility, a researcher seeking subjects to participate in a research study, church worship services, a dermatologist, a tanning salon, eateries, shuttle services, a mortgage company, Purdue's bookstore, a news station, insurance companies, and universities.

116.    CityBus has also allowed ads that are inconsistent with its Advertising Policy as written.

117.    CityBus allowed an ad for a candidate for mayor that included the words "Putting People First."

118.    A true and correct depiction of that ad is pictured below:



119.    CityBus also permitted an ad for a judicial candidate that included the words "Fair, Trusted, and Committed to Tippecanoe County."

120.    A true and correct depiction of that ad is pictured below:



121.    CityBus also accepted for placement on or in its buses multiple ads promoting voting.

122.    For example, one ad that CityBus accepted said "Exercise Your Right to Vote," along with the text "Election Day is November 8th."

123.    A true and correct depiction of that ad is pictured below:



124.    CityBus accepted another ad saying "Pump Some Democracy," along with the text "Election Day is November 8th."

125.    A true and correct depiction of that ad is pictured below:



126.    CityBus also accepted an ad saying "Register and Vote – It Matters!!" along with

the words "League of Women Voters of Greater Lafayette," the League's website

(www.leaguelafayette.org), and the League's logo.

127.    A true and correct depiction of that ad is pictured below:



128.    The ad that CityBus accepted from the League of Women Voters of Greater

Lafayette prominently displays the League's name, logo, website, and encouragement to register

and vote even though the League's website expressly confirms that the League's very purpose is

political, in that it "influences public policy through education and advocacy" and "advocate[s]

19

for or against particular policies in the public interest." *Available at*

http://leaguelafayette.org/about.html.

129. CityBus allowed an ad saying "Need Health Insurance?  Too Bad . . .  You May Have Just Lost the Chance for Coverage," which also encouraged people to learn more "about the healthcare crisis in Indiana" at a conference sponsored by "Rebuild the Dream."

130. A true and correct depiction of that ad is pictured below:



131. An article published the day after the advertised conference indicated that the panelists speaking at the event were advocating for the expansion of Medicaid in Indiana, which was opposed by then-Governor Mike Pence.

132. According to that article, one panelist "said Medicaid expansion and universal health care are modern social justice issues." *Available at* https://bit.ly/2t6JEtT.

133. CityBus also accepted an ad proclaiming "Finally someone has the power to help the environment . . . YOU!" and encouraging people to "[s]how your support for our community and the environment" by "[s]ign[ing] up for EnviroWatts today!"

134.    The EnviroWatts ad included EnviroWatts' website address (www.tipmont.org) and logo (which includes the phrase "Earth Friendly Energy Alternatives").

135.    A true and correct depiction of that ad is pictured below:



136.    EnviroWatts' website explains that "EnviroWatts provides a way for you to show your support for environmental improvement projects in your community, support the environment, and demonstrate your interest in renewable energy." *Available at* https://tipmont.org/community/envirowatts.

137.    That website also explains that "[w]hen you sign up for EnviroWatts, you elect to pay a small premium . . . on your electric bill" into "the EnviroWatts Trust Fund," which non-profit organizations can then apply to for grants "to be used for environmental projects."

138.    CityBus accepted an ad educating the public with the information that "1 in 8 of our neighbors struggles with hunger" and encouraging people to "drive away hunger."

139.    A true and correct depiction of that ad is pictured below:



140.    One ad that CityBus accepted encouraging people to "drive away hunger" even said "Engage.  Donate.  Advocate."

141.    Another ad that CityBus accepted educated the public by informing them that "HPV-related diseases can affect BOTH males and females," and encouraged the public to "[r]educe your child's risk—get vaccinated."

142.    A true and correct depiction of that ad is pictured below:



143.    Numerous political controversies have surrounded HPV vaccinations.

144.    In fact, in early 2015, the Indiana legislature rejected a bill calling for the State Department of Health to establish goals and plans to increase HPV vaccination rates to eighty percent for Indiana's children between the ages of thirteen and sixteen.

145.    An article published on February 25, 2015 in the *Indianapolis Star* reported that supporters of the legislation claimed that they "had been a victim of a campaign by conservative

groups who are squeamish about the nature of HPV, a sexually transmitted virus that can lead to several types of cancer." *Available at* https://indy.st/2t1QlOF.

146.    That article also reported that Indiana's House Speaker "said the bill generated a lot of questions and comes as there is a national debate about the safety of vaccinations."

147.    CityBus also accepted an ad that educates the public by stating that "[b]reastfeeding has natural benefits for both mother and child."

148.    That ad includes a picture of an infant nursing with the words "[n]urture me with nutrients" superimposed over the picture.

149.    The ad also informs the reader that "[y]our actions do make a difference," that the ad is sponsored by "Labor of Love," and that "Labor of Love" is dedicated to "Helping Indiana Reduce Infant Death."

150.    A true and correct depiction of that ad is pictured below:



151.    Thus, this ad provides factual information about the benefits of breastfeeding, encourages the public to take action based on that information, and explicitly states the sponsoring organization's goal of reducing infant deaths.

152.    Promotion of breastfeeding has prompted political action, such as jurisdictions passing laws to ensure that breastfeeding mothers are not prosecuted for indecent exposure and are not removed from public businesses for breastfeeding.

153.    CityBus applied its Advertising Policy in an arbitrary and unreasonable manner by denying TCRTL's ad and allowing so many other comparable ads.

154.    Given CityBus's Advertising Policy and practice relating to accepting or rejecting ads, CityBus lacks any legitimate basis to prohibit TCRTL's ad.

155.    TCRTL desires immediate access to display TCRTL's ad on CityBus's buses and to gain equal access to all of the advertising opportunities CityBus makes available to others in their efforts to communicate to people in the public square.

156.    CityBus's policy and practice of granting unlimited discretion to its officials to accept or reject ads based on vague terms and viewpoint prevented and continues to prevent TCRTL from accessing CityBus's forum for advertising—a vital means for TCRTL to carry out its educational efforts—on equal terms with others similarly situated to TCRTL.

157.    TCRTL remains ready and willing to immediately place TCRTL's ad on CityBus's buses.

158.    TCRTL suffered, and continues to suffer, irreparable harm due to CityBus's refusal to allow TCRTL's ad on its buses.

## ALLEGATIONS OF LAW

159.    TCRTL's ad is fully protected by the First Amendment.

160.    Private speakers are entitled to equal access to public fora, free from content-based and viewpoint-based discrimination.

161.    Policies establishing prior restraints on private speech may not delegate overly broad authority to government decision-makers who enforce those policies.

162.    Content-based and viewpoint-based restrictions on speech in designated public forums and limited designated public forums are presumptively unconstitutional and are subject to strict scrutiny.

163.    Speech restrictions in non-public forums that are viewpoint-based, arbitrary, unreasonable, unjustifiable, vague, discriminatory, or allow for unbridled discretion are forbidden.

164.    All of the acts of CityBus, its officers, officials, agents, employees, and servants were executed and are continuing to be executed by CityBus under the color and pretense of the policies, statutes, ordinances, regulations, customs, and usages of the State of Indiana.

165.    TCRTL has no adequate or speedy remedy at law to correct or redress the deprivation of its rights by CityBus.

166.    Unless CityBus's unconstitutional policies and practices are enjoined, TCRTL will continue to suffer irreparable harm and violations of its First and Fourteenth Amendment rights.

167.    TCRTL has suffered damages as a result of CityBus's unconstitutional policies and practices.

## FIRST CAUSE OF ACTION: FIRST AMENDMENT FREEDOM OF SPEECH

168.    Plaintiff re-alleges, and incorporates herein, as though fully set forth, paragraphs 1 through 167 of this Verified Complaint.

169.    CityBus created a public forum by establishing a policy and practice of allowing organizations to place advertisements on a wide variety of topics—including topics like the one

addressed by TCRTL's ad—on the inside and outside of CityBus's buses for the purpose of communicating to the public, including members of the public using public thoroughfares and sidewalks.

170.    CityBus's written Advertising Policy prohibits "political campaign speech referring to a . . . political viewpoint" and certain advertising that includes a "statement of a political viewpoint" or graphics that "imply a political viewpoint" (collectively referred to as "Speech Prohibitions").

171.    CityBus's written Advertising Policy allows CityBus's officials to reject any ad that "falls within, or may fall within," these Speech Prohibitions.

172.    CityBus's written Advertising Policy provides that CityBus may "suspend, modify, or revoke" its Speech Prohibitions "to fulfill the goals and objectives of CityBus" or to "accommodate [CityBus's] primary transportation function."

173.    Pursuant to CityBus's policies and procedures, CityBus rejected TCRTL's ad on the ground that it contained a "political viewpoint" in violation of CityBus's Advertising Policy.

174.    But CityBus has permitted ads in and on its buses that violate the terms of its own Advertising Policy, ads that state a "political viewpoint," and—if it can be said that TCRTL's ad expresses a "political viewpoint"—other ads that must also be seen as expressing a "political viewpoint."

175.    CityBus prohibited TCRTL's ad even though it seemingly satisfies all of the criteria included in CityBus's Advertising Policy.

176.    CityBus rejected TCRTL's ad because of opposition to the ad's message.

177.    CityBus's Speech Prohibitions are vague, content-based and viewpoint-based restrictions on speech that violate the Free Speech Clause of the First Amendment both facially

and as applied.  These constitutional infirmities led directly to the rejection of TCRTL's ad because of its content and viewpoint.

178.  CityBus's Speech Prohibitions, grant of authority to CityBus officials to reject any ad that "falls within, or may fall within" those Speech Prohibitions, and authorization to "suspend, modify, or revoke" its Speech Prohibitions "to fulfill the goals and objectives of CityBus" or to "accommodate [CityBus's] primary transportation function" also violate the First Amendment as applied to CityBus's rejection of TCRTL's ad because CityBus officials exercised their unbridled discretion under the vague terms to reject TCRTL's ad because of the viewpoint expressed and to treat TCRTL unequally as compared with other advertisers expressing different viewpoints, some of which were patently political.

179.  CityBus's Speech Prohibitions also violate the Free Speech Clause of the First Amendment, both facially and as applied to reject TCRTL's ad, because they create an unreasonable, arbitrary, and disproportionate burden on the exercise of protected speech without any legitimate justification.

180.  CityBus's Speech Prohibitions, allowance for prohibiting speech that "falls within, or may fall within" those Speech Prohibitions, and authorization to "suspend, modify, or revoke" its Speech Prohibitions "to fulfill the goals and objectives of CityBus" or to "accommodate [CityBus's] primary transportation function" are also facially overbroad speech restrictions in violation of the First Amendment because they ban—or allow for banning—a substantial amount of protected First Amendment expression.

181.  CityBus's refusal to allow TCRTL to engage in certain speech that it would allow certain other organizations to engage in simply because of the other protected First Amendment activities that TCRTL engages in violates the First Amendment, constitutes a speaker-based

exclusion that results in content-based and viewpoint-based suppression of speech, and imposes an unconstitutional condition on access to the advertising forum CityBus established.

182.    CityBus's Advertising Policy does not grant CityBus officials permission to consider other First Amendment activities of an advertiser in determining whether to allow a given ad from that advertiser, yet it did so with TCRTL.

183.    CityBus's discriminatory, arbitrary, and unreasonable enforcement of its Advertising Policy violates TCRTL's free-speech rights by prohibiting TCRTL from engaging in protected expression to educate the public about the humanity of unborn children while allowing other organizations to educate the public with their views regarding politically-charged topics.

184.    CityBus's Speech Prohibitions operate as a prior restraint on speech, both facially and as-applied to TCRTL's ad, and therefore bear a presumption against their constitutional validity under the First Amendment—a presumption CityBus cannot overcome.

185.    CityBus's Speech Prohibitions, grant of authority to CityBus officials to reject any ad that "falls within, or may fall within" those Speech Prohibitions, and authorization to "suspend, modify, or revoke" its Speech Prohibitions "to fulfill the goals and objectives of CityBus" or to "accommodate [CityBus's] primary transportation function" are facially invalid under the First Amendment because they use vague terms and grant public officials unbridled discretion to reject speech based on their personal predilections rather than constraining officials with objective criteria for distinguishing between permissible and impermissible advertising in a non-arbitrary, viewpoint-neutral manner.

186.    The provisions of CityBus's Advertising Policy discussed in this cause of action and CityBus's application of those provisions burden more of TCRTL's speech than is necessary because CityBus totally bars TCRTL's educational message from CityBus's buses without any

reasonable basis for doing so, even though TCRTL's ad is materially indistinguishable from other ads allowed on and in CityBus's buses.

187.    CityBus's practices and the provisions of its Advertising Policy discussed in this cause of action chill, deter, and restrict TCRTL from freely expressing its educational message regarding the humanity of unborn children.

188.    The provisions of CityBus's Advertising Policy discussed in this cause of action, facially and as applied to reject TCRTL's ad, are not the least restrictive means of serving any compelling or even legitimate interest CityBus may have.

189.    As a direct and proximate result of CityBus's violation of the Free Speech Clause of the First Amendment, TCRTL has suffered and will suffer irreparable harm, including the loss of its constitutional rights, entitling TCRTL to declaratory and injunctive relief as well as damages.

WHEREFORE, TCRTL respectfully prays that the Court grant the relief set forth herein in the Prayer for Relief.

### SECOND CAUSE OF ACTION: FOURTEENTH AMENDMENT DUE PROCESS

190.    Plaintiff re-alleges, and incorporates herein, as though fully set forth, paragraphs 1 through 167 of this Verified Complaint.

191.    The Due Process Clause of the Fourteenth Amendment prohibits CityBus from censoring speech pursuant to vague standards that grant officials unbridled discretion.

192.    CityBus's Advertising Policy prohibits "political campaign speech referring to a . . . political viewpoint" and certain advertising that includes a "statement of a political viewpoint" or graphics that "imply a political viewpoint" (collectively referred to as "Speech Prohibitions").

193.    Moreover, CityBus's written Advertising Policy allows CityBus's officials to reject any ad that "falls within, or may fall within," these Speech Prohibitions.

194.    Furthermore, CityBus's written Advertising Policy provides that CityBus may "suspend, modify, or revoke" its Speech Prohibitions "to fulfill the goals and objectives of CityBus" or to "accommodate [CityBus's] primary transportation function."

195.    Persons of common intelligence must guess (and will reach different conclusions) about what expression runs afoul of CityBus's Speech Prohibitions and what speech will satisfy CityBus's officials and be permitted.

196.    Prior to submitting an ad to CityBus, persons of common intelligence have no way of determining what speech CityBus will allow.

197.    CityBus has no binding definitions, guidelines, directives, or objective criteria explaining what constitutes "political campaign speech referring to a . . . political viewpoint," what constitutes a "statement of a political viewpoint," what constitutes "[g]raphics . . . [that] imply a political viewpoint," what "falls within, or may fall within" CityBus's Speech Prohibitions, and what speech should be banned or permitted "to fulfill the goals and objectives of CityBus" or to "accommodate [CityBus's] primary transportation function," and all of these terms are vague, subjective, undefined, and result in CityBus officials having unbridled discretion to permit or prohibit protected speech for any reason, including arbitrary, unreasonable, and viewpoint-based reasons based on their personal predilections.

198.    The provisions of CityBus's Advertising Policy discussed in this cause of action, facially and as applied to prohibit TCRTL's ad, violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

199.     As a direct and proximate result of CityBus's violation of the Due Process Clause of the Fourteenth Amendment, TCRTL has suffered and will suffer irreparable harm, including the loss of its constitutional rights, entitling TCRTL to declaratory and injunctive relief as well as damages.

200.     WHEREFORE, TCRTL respectfully prays that the Court grant the relief set forth herein in the Prayer for Relief.

**THIRD CAUSE OF ACTION: FOURTEENTH AMENDMENT EQUAL PROTECTION**

201.     Plaintiff re-alleges, and incorporates herein, as though fully set forth, paragraphs 1 through 167 of this Verified Complaint.

202.     The Equal Protection Clause of the Fourteenth Amendment requires CityBus to treat similarly-situated speakers alike.

203.     CityBus's Advertising Policy prohibits "political campaign speech referring to a . . . political viewpoint" and certain advertising that includes a "statement of a political viewpoint" or graphics that "imply a political viewpoint" (collectively referred to as "Speech Prohibitions").

204.     Moreover, CityBus's written Advertising Policy allows CityBus's officials to reject any ad that "falls within, or may fall within," these Speech Prohibitions.

205.     Furthermore, CityBus's written Advertising Policy provides that CityBus may "suspend, modify, or revoke" its Speech Prohibitions "to fulfill the goals and objectives of CityBus" or to "accommodate [CityBus's] primary transportation function."

206.     Pursuant to CityBus's Advertising Policy and practices, CityBus allows organizations to place educational ads on CityBus's buses.  CityBus even went so far as to ignore

its own Speech Prohibitions to permit ads that patently express political viewpoints on and in CityBus's buses. Yet CityBus rejected TCRTL's ad educating the public.

207.    CityBus treated TCRTL and TCRTL's ad unequally as compared with its treatment of similarly-situated organizations and ads and, even more egregiously, as compared with CityBus's treatment of organizations whose ads likely violated CityBus's Speech Prohibitions but were permitted nevertheless.

208.    CityBus discriminatorily and arbitrarily enforces its Advertising Policy in a manner that violates TCRTL's rights under the Equal Protection Clause by prohibiting TCRTL from engaging in protected expression to educate the public about the humanity of unborn children while allowing similarly-situated organizations to educate the public with their views regarding politically-charged topics.

209.    CityBus also violated TCRTL's rights under the Equal Protection Clause by determining that TCRTL cannot engage in certain speech that similarly-situated organizations can engage in on and in CityBus's buses.

210.    By discriminating against the content and viewpoint of TCRTL's ad and TCRTL's viewpoint as an organization, CityBus is treating TCRTL's educational speech differently than the educational speech of other similarly-situated organizations.

211.    CityBus's practices and the provisions of its Advertising Policy discussed in this cause of action violate TCRTL's fundamental rights, including TCRTL's right to freedom of speech, and discriminatory intent is presumed.

212.    CityBus lacks a compelling state interest or even a rational basis to treat TCRTL and TCRTL's ad in such a disparate manner, and denying TCRTL the equal access that

similarly-situated organizations and ads enjoy is not narrowly tailored because it is a restriction on speech that is unrelated to any legitimate interest.

213.    Moreover, CityBus lacks a rational basis or compelling interest for the provisions of CityBus's Advertising Policy discussed in this cause of action, and those provisions are not narrowly tailored to advance any compelling governmental interest.

214.    The provisions of CityBus's Advertising Policy discussed in this cause of action and CityBus's practices, both facially and as applied to TCRTL, violate the right to equal protection of the laws as guaranteed by the Fourteenth Amendment to the United States Constitution.

215.    As a direct and proximate result of CityBus's violation of the Equal Protection Clause of the Fourteenth Amendment, TCRTL has suffered and will suffer irreparable harm, including the loss of its constitutional rights, entitling TCRTL to declaratory and injunctive relief as well as damages.

216.    WHEREFORE, TCRTL respectfully prays that the Court grant the relief set forth herein in the Prayer for Relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

a.    Issue a Preliminary and Permanent Injunction restraining CityBus, its officers, officials, agents, employees, and all other persons acting in active concert with it, from preventing TCRTL from educating the public about the humanity of unborn children through the advertising forum that CityBus established on and in its buses;

b.    Render a Declaratory Judgment declaring the provisions of CityBus's Advertising Policy challenged herein—namely, the provisions allowing CityBus to ban any speech that "falls

within, or may fall within" the categories of "political campaign speech referring to a . . . political viewpoint" or certain other advertising that includes a "statement of a political viewpoint" or graphics that "imply a political viewpoint," and the provision allowing CityBus to "suspend, modify, or revoke" these speech prohibitions "to fulfill the goals and objectives of CityBus" or to "accommodate [CityBus's] primary transportation function"—unconstitutional, both facially and as applied to ban TCRTL's expression educating the public about the humanity of unborn children, under the First and Fourteenth Amendments to the United States Constitution;

c.      Adjudge, decree, and declare the rights and other legal relations of the parties to the subject matter here in controversy, in order that such declarations shall have the force and effect of a final judgment;

d.      Retain jurisdiction of this matter for the purpose of enforcing any Orders;

e.      Award Plaintiff the costs and expenses of this action, including a reasonable attorneys' fees award in accordance with 42 U.S.C. § 1988;

f.      Award nominal and compensatory damages to Plaintiff for the violation of TCRTL's constitutional rights;

g.      Issue the requested injunctive relief without a condition of bond or other security being required of TCRTL; and

h.      Grant such other and further relief as the Court deems equitable and just in the circumstances.

Respectfully submitted this 23rd day of July, 2018.

By:  s/Kevin H. Theriot

Thomas M. Dixon
Indiana Bar No. 18611-71
**DIXON, WRIGHT &**
**ASSOCIATES, P.C.**
55255 Birchwood Court
Osceola, IN 46561
(574) 315-6455
(574) 675-7783 (facsimile)
tdixon3902@comcast.net

Kevin H. Theriot
Arizona Bar No. 030446
Kenneth J. Connelly*
Arizona Bar No. 025420
Samuel D. Green*
Arizona Bar No. 032586
**ALLIANCE DEFENDING FREEDOM**
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
(480) 444-0028 (facsimile)
ktheriot@ADFlegal.org
kconnelly@ADFlegal.org
sgreen@ADFlegal.org

David A. Cortman
Georgia Bar No. 188810
**ALLIANCE DEFENDING FREEDOM**
1000 Hurricane Shoals Rd. NE
Suite D-1100
Lawrenceville GA 30043
(770) 339-0774
(770) 339-6744 (facsimile)
dcortman@ADFlegal.org

*Attorneys for Plaintiff*
*Application for Admission Forthcoming

35

## **VERIFICATION OF COMPLAINT**

I, KEVIN NIEBRUGGE, a citizen of the United States and a resident of the State of Indiana, hereby declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that I have read the foregoing Verified Complaint and the factual allegations therein, and the facts as alleged are true and correct to the best of my knowledge and recollection.

Executed this ___ day of July, 2018, at __West Lafayette__, Indiana.

KEVIN NIEBRUGGE,
*in his personal capacity and on*
*behalf of Tippecanoe County Right*
*to Life, Inc.*